IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JOHNNY RAY FINGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:17CV188 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Johnny Ray Finger ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.    PROCEDURAL HISTORY

Plaintiff protectively filed applications for Disability Insurance Benefits and Supplemental Security Income Benefits on August 26, 2013, alleging a disability onset date of September 21, 2012 in both applications. (Tr. at 153, 258-67.)[1]  His applications were denied initially (Tr. at 69-108) and upon reconsideration (Tr. at 109-49).   Thereafter, Plaintiff

---

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #8].

requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 207-09.) Plaintiff, along with his attorney and an impartial vocational expert, attended the subsequent video hearing on September 17, 2015. (Tr. at 153.) At the hearing, Plaintiff amended his alleged onset date to December 1, 2013. (Id.) The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act from his amended alleged onset date through November 25, 2015, the date of the administrative decision. (Tr. at 165.) On January 11, 2017, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-5.)

## II.   LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270

F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since his amended alleged onset date. Plaintiff therefore met his burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> status post cervical fusion, cervical radiculopathy, and major depressive disorder.

(Tr. at 155.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 156.) Therefore, the ALJ assessed Plaintiff's RFC and determined that he had the following limitations:

> [T]he claimant can lift or carry up to ten pounds occasionally and frequently. [He] can stand or walk for four hours and can sit for up to six hours. The claimant can engage in occasional stooping, crouching, kneeling, crawling or climbing of ramps and stairs. [He] can engage in frequent handling/fingering, and occasional overhead reaching with both extremities, but should never climb

ladders, ropes[,] or scaffolds. The claimant is limited to simple, routine[,] and repetitive work tasks and can occasionally interact with supervisors and have incidental interaction with the general public[,] but should not engage in direct customer service. [He] can work in proximity to co-workers but should not work with them. Additionally, the claimant can work in an environment with few, in any, workplace changes. Furthermore, the claimant would need a sit/stand option every hour for three to five minutes.

(Tr. at 158.) Based on the RFC determination, the ALJ found under step four of the analysis that Plaintiff could not perform any of his past relevant work. (Tr. at 163.) However, the ALJ determined at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, he could perform other jobs available in the national economy. (Tr. at 164-65.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 165.)

Plaintiff now contends that the ALJ erred in failing to analyze and assign weight to the medical opinion statement completed by Dr. Landis S. Williams, one of Plaintiff's treating pain management physicians. After a thorough review of the record, the Court agrees that, under the specific fact of this case, the ALJ's omission merits remand.

For claims, like Plaintiff's, that are filed before March 24, 2017, the ALJ evaluates medical opinion evidence in accordance with 20 C.F.R. §§ 404.1527(c) and 416.927(c) and the "treating physician rule" embodied within the regulations. Brown v. Comm'r Soc. Sec., 873 F.3d 251, 255 (4th Cir. 2017). Under the regulations, "medical opinions" are "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." Id. (citing 20 C.F.R. § 404.1527(a)(1)); see also 20 C.F.R. § 416.927(a)(1). While the regulations mandate that the

ALJ evaluate each medical opinion presented to him, generally "more weight is given to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you." Brown, 873 F.3d at 255 (quoting 20 C.F.R. § 404.1527(c)(1)); see also 20 C.F.R. § 416.927(c)(1). And, under what is commonly referred to as the "treating physician rule," the ALJ generally accords the greatest weight—controlling weight—to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). However, if a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record," it is not entitled to controlling weight. Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5; 20 C.F.R. § 404.1527(c)(2); see also Brown, 873 F.3d at 255; Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178.[4] Instead, the opinion must be evaluated and weighed using all of the factors provided in 20 C.F.R. § 404.1527(c)(2)-(c)(6), including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any

---

[4] For claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. However, the claim in the present case was filed before March 27, 2017, and the Court has therefore analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

other factors that may support or contradict the opinion. In addition, even if an opinion by a treating physician is given controlling weight with respect to the nature and severity of a claimant's impairment, opinions by physicians regarding the ultimate issue of whether a plaintiff is disabled within the meaning of the Act are never accorded controlling weight because the decision on that issue is reserved for the Commissioner alone. 20 C.F.R. § 404.1527(d). "Thus, for example, when a medical source renders an opinion that a claimant is 'disabled' or 'unable to work,' the ALJ will consider 'all of the medical findings and other evidence that support' the medical source's opinion, but will not necessarily make a favorable disability determination." Brown, 873 F.3d at 256 (citing 20 C.F.R. § 404.1527(d)(1)); see also 20 C.F.R. § 416.927(d)(1).

Where an ALJ declines to give controlling weight to a treating source opinion, he must "give good reasons in [his] ... decision for the weight" assigned, taking the above factors into account. 20 C.F.R. § 416.927(c)(2). "This requires the ALJ to provide sufficient explanation for 'meaningful review' by the courts." Thompson v. Colvin, No. 1:09CV278, 2014 WL 185218, at *5 (M.D.N.C. Jan. 15, 2014) (quotations omitted); see also SSR 96–2p (noting that the decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight"). Notably, even "implicit assignments of weight can support meaningful review" so long as the ALJ's decision "make[s] clear that he 'recognized and evaluated the treating relationships' of medical sources.'"

Thomas v. Comm'r of Soc. Sec., No. Civ. WDQ-10-3070, 2012 WL 670522, at *7 (D. Md. Feb. 27, 2012).

In the present case, the ALJ omitted any reference to a one-page medical opinion statement completed by Dr. Williams on September 11, 2015. (Tr. at 518.) In the statement, Dr. Williams checked boxes finding that the following were "present on examination or testing":

> Chronic neck pain with loss of range of motion
> Associated numbness and tingling that radiate into bilateral upper extremities
> Chronic low back pain
> Carpal tunnel syndrome
> Significant depressive disorder due to physical condition

(Tr. at 518.) Dr. Williams then opined that, due to his impairments, Plaintiff could only occasionally "perform fine and gross manipulative tasks with his upper extremities," would be unable to perform sedentary work on a full-time basis, and would be off task for more than 20% of the workday or absent from work more than two days per month due to his symptoms. (Tr. at 518.)

Defendant concedes that the ALJ failed to address Dr. Williams' opinion. Defendant nevertheless contends that the ALJ's failure to address this opinion constitutes harmless error, as another physician, Dr. Joseph Davis, completed a one-page medical opinion statement similar to Dr. Williams' statement just one day earlier, on September 10, 2015, and checked or circled the same eight answers as Dr. Williams. (See Tr. at 163, 516, 518.) Dr. Davis also added notes indicating the degree to which Plaintiff's sitting, standing, and manipulative limitations would impact his work and included two diagnoses, namely depression and low back pain, not listed by Dr. Williams. (Tr. at 516, 518.) The ALJ considered Dr. Davis'

opinions at length in her decision and ultimately accorded them "some weight." Defendant asserts that, because Dr. Williams' medical statement contains the same opinions as Dr. Davis', the ALJ's reasons for discounting Dr. Davis' opinions are "equally applicable" to Dr. Williams, and therefore support meaningful review. See Yuengal v. Astrue, No. 4:10-CV-42-FL, 2010 WL 5589102, at *9 (E.D.N.C. Dec. 17, 2010) (finding harmless error where the ALJ failed to consider the opinion of the plaintiff's treating psychiatrist but evaluated an identical opinion from the psychiatrist who handled the plaintiff's subsequent psychiatric care).

However, Dr. Williams and Dr. Davis are not part of the same medical practice, and there is no basis to believe that they completed the forms in a coordinated way. Dr. Williams is an anesthesiologist at the Northeast Pain Management Center. Plaintiff received treatment from Dr. Williams and other physicians and nurse practitioners at the Northeast Pain Management Center over a two-year period from September 2013 to August 2015. (Tr. at 159-160, 519, 402, 470, 511, 518-19.) In contrast, Dr. Davis was Plaintiff's primary care physician at Concord Internal Medicine. (Tr. at 31, 163, 447, 508, 516.) Thus, this is not a situation where two providers at the same practice completed a duplicate form, or where a later provider who took over care in the same specialty completed a form that incorporated the findings in the record of an earlier provider. Instead, Dr. Williams' medical statement appears to be a separate opinion that reaches the same conclusions as Dr. Davis.

Moreover, the sole reason the ALJ gave for discounting Dr. Davis' opinion was that it was "not consistent with the greater weight of the clinical evidence which demonstrates that the claimant is capable of a wide range of function despite his pain levels." (Tr. at 163.) As

Plaintiff correctly notes, Dr. Davis' opinion was consistent with Dr. Williams' unaddressed opinion. Thus, as Plaintiff notes in his Reply Brief, Defendant's argument:

> ignores the fact that the ALJ cited inconsistency with other evidence on file as a reason for his assigning Dr. Davis' opinion less than controlling weight. (See Tr. at 163.) Thus, the fact that Dr. Williams' medical opinion is consistent with Dr. Davis' opinion does not render it less persuasive, but rather undermines substantial support for the ALJ's treatment of Dr. Davis' medical opinion.

(Pl.'s Resp. Br. [Doc. #15] at 2.)

In addition, the ALJ's failure to address Dr. Williams' opinion statement is further aggravated by the ALJ's failure to even mention or address the treatment records reflecting Dr. Williams' examination of Plaintiff prior to the completion of his September 2015 medical opinion statement. In generally reviewing the treatment records, the ALJ noted that Plaintiff began experiencing increased neck pain, along with numbness and tingling in his arms, in May 2013. Plaintiff had previously undergone an anterior cervical spine discectomy and fusion of the C3 through C6 levels in 2009, following injury in a car accident. (Tr. at 159.) Although Plaintiff's 2013 MRIs warranted a referral to a neurosurgeon, Plaintiff was uninsured and unable to afford further surgery at that time. (Tr. at 159-60, 470-71.) Instead, he was referred to a pain management program, where, among other providers, he was treated by Dr. Williams. (Id.) The ALJ noted that, in December 2013, Plaintiff "was not a candidate for epidural steroid injections." (Tr. at 160.) However, in so noting, the ALJ failed to mention that the reason Plaintiff was not a candidate for the injections was that his stenosis was considered too severe. (Tr. at 438, 471, 511.) Instead, his providers recommended that "he get in to see his neurosurgeon as soon as possible." (Tr. at 430.) Because Plaintiff was still unable to afford specialist treatment a year later, Dr. Williams agreed to try a "right C3-C4 and C5 medial

branch block" to help Plaintiff achieve better pain control. (Tr. at 471.) Plaintiff saw Dr. Williams in April 2015, and Dr. Williams noted that Plaintiff

> was found to have a combination of cervical radiculopathy with severe left and moderate to severe foraminal stenosis and change at the C5-C6 level, also mild to moderate canal stenosis from combined disk bulge and endplate spurring ligamentum flavum thickening at C5-C6 with restriction of the cerebrospinal fluid, both anterior and posterior, with slight flattening of the left ventral cord, no edema or gliosis of the cervical spine noted.

(Tr. at 511.) Dr. Williams noted that Plaintiff's MRI reflected "fairly severe stenosis" at C5-C6 and "left side neural foraminal narrowing which was graded severe at the C6-C7 level where more severe bilateral narrowing was noted at C5-C6." (Tr. at 511.) Dr. Williams noted that Plaintiff experienced "marked difficulty with pain in the hand, particularly the thumb and index finger and pain with radiation from neck into the arms bilaterally, right side greater than left," and "marked difficulty with extension and flexion of the wrist causing pain in the medial aspect of the wrist and tingling into the index finger and thumb." (Tr. at 511.) Dr. Williams explained that "comorbidities may be at play to include carpal tunnel syndrome in conjunction with upper extremity radiculopathy in a C5, C6 and C7 distribution, also potentially affecting C4 as well." (Tr. at 511.) Dr. Williams then chronicled the following objective findings upon examination:

> Motor examination showed bilateral weakness in arm abduction at 15 degrees, graded 4/5. Shoulder shrug graded 4/5, weaker on the right than left. Elbow flexion and extension both 4/5, somewhat weaker potentially on the right side again, particularly with elbow extension. Wrist flexion and extension both weakened, greater on the right side, again, still within the 3-4 range in strength. Finger flexion graded 4/5 as well, greater strength was noted on the left than right. Also, opponens of thumb to index finger weaker on the right graded 4/5 and inability to easily place thumb to fifth finger at all, particularly on the right. The patient did demonstrate positive Chvostek's sign with increased pain with extension of the wrists and tapping on carpal tunnel on the right, not so on the left. This pain was worsened in the wrists with both attempts at extreme ranges

to match left wrist of flexion and extension. Deep tendon reflexes for bilateral triceps tendons, biceps tendons and brachioradialis were ¼.

(Tr. at 512.) In light of these findings, Dr. Williams planned to perform "a median nerve block at the wrists . . . to assess what degree of symptomatology is related to carpal tunnel syndrome in the right upper extremity versus radiculopathy from cervical pathology." (Id.) He also scheduled "a cervical selective nerve root block and/or transforaminal epidural injection of the right C5-C6 and C6-C7 neural foramen in approximately 2-4 weeks." (Id.) In July and August of 2015, Dr. Williams performed right transforaminal epidural steroid injections at C5-C6 and C6-C7. (Tr. at 161, 532-35.) Dr. Williams specifically noted that these injections differed from the interlaminar epidural steroid injections precluded by the severity of Plaintiff's stenosis. (Tr. at 511.) Dr. Williams also noted that Plaintiff "does have cervical facet arthropathy, without insurance coverage to perform a medial branch denervation in the area." (Tr. at 534.)

The ALJ failed to mention or cite Dr. Williams' April 2015 treatment note or any of the findings therein. Its absence from the administrative decision compounds the ALJ's previous error, as she omitted not only Dr. Williams' opinion, but much of the basis for it. As noted above, Dr. Williams indicated in his September 11, 2015 statement that Plaintiff suffered from "chronic neck pain with loss of range of motion," "associated numbness and tingling that radiate[s] into [the] bilateral upper extremities," "chronic low back pain," "carpal tunnel syndrome," and "significant depressive disorder due to physical symptoms." (Tr. at 518.) Dr. Williams then opined that, due to his impairments, Plaintiff could only occasionally "perform fine and gross manipulative tasks with his upper extremities," would be unable to perform sedentary work on a full-time basis, and would be off task for more than 20% of the workday

or absent from work more than two days per month.  (Tr. at 518)  Ultimately, the ALJ's failure to address Dr. Williams' opinion evidence and related treatment records render the Court unable to meaningfully review the ALJ's decision to determine if it is supported by substantial evidence, and attempts to infer how the ALJ would have weighed or addressed this evidence "would require excessive intrusion into the ALJ's domain." Anderson v. Colvin, No. 1:10CV671, 2014 WL 1224726 at *3 (M.D.N.C. March 25, 2014).[5]  As noted in Anderson, while the Court may make simple conclusions of law in finding that an ALJ's error is harmless, the Court may not "parse the administrative transcripts and make . . . dispositive findings of fact that the ALJ did not make." Id. at *4. Here, accepting the Commissioner's arguments would require the Court to do just that.[6]  The relevant evidence should be considered and addressed by the ALJ in the first instance.  Accordingly, this matter merits remand.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g).  The Commissioner should be directed to remand the matter to the ALJ for proceedings consistent with this Recommendation.  To this extent, Defendant's Motion for Judgment on the Pleadings [Doc. #13] should be DENIED, and

---

[5] In Anderson, the Court noted that "[r]eview of the ALJ's ruling is limited further by the so-called 'Chenery Doctrine,' which prohibits courts from considering post hoc rationalizations in defense of administrative agency decisions. . . . Under the doctrine, a reviewing court 'must judge the propriety of [agency] action solely by the grounds invoked by the agency. . . . If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.' " Id. at *1 (quoting Sec. & Exch. Comm'n v. Chenery Corp., 332 U.S. 194 (1947)). In applying this doctrine in Anderson, the Court noted that "jurisprudence on this issue is far from clear," and "this court will err on the side of caution" and avoid "excessive intrusion into the ALJ's domain." Id. at *3.

[6] In addition, as discussed above, because both Dr. Williams' contemporaneous opinion and his earlier treatment notes corroborate Dr. Davis' findings, yet were omitted from the ALJ's decision, there remain unaddressed issues regarding how the ALJ would address Dr. Davis' opinion in light of Dr. Williams' treatment notes and similar opinion evidence.

Plaintiff's Motion for Judgment Reversing the Commissioner [Doc. #11] should be GRANTED. However, to the extent that Plaintiff's motion seeks an immediate award of benefits, it should be DENIED.

This, the 26th day of February, 2018.

_____/s/ Joi Elizabeth Peake_____
United States Magistrate Judge
